UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LAURIE ORF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:13-CV-1190 (CEJ) |
| | ) | |
| CAROLYN W. COLVIN, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On October 8, 2010, plaintiff Laurie Orf filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et. seq.* (Tr. 122-123). The application alleged that disability began on October 4, 2008. Plaintiff subsequently amended her alleged onset date to February 10, 2009. (Tr. 124). After the application was denied on initial consideration (Tr. 73-77), plaintiff requested a hearing from an Administrative Law Judge (ALJ). See Tr. 80-85 (acknowledging request for hearing).

Plaintiff and counsel appeared for a hearing on April 11, 2012. (Tr. 34-64). The ALJ issued a decision on June 11, 2012 denying plaintiff's application (Tr. 17-28), and the Appeals Council denied plaintiff's request for review on April 19, 2013. (Tr. 1-5). Accordingly, this decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

## A. **Disability Application Documents**

Plaintiff's Disability Report listed her disabling conditions as "breaks in left foot," arthritis, and depression. (Tr. 167). Plaintiff's medications included Citalopram[1] and Vicodin.[2] (Tr. 170). She listed her previous jobs as grocery stocker and landscaper. (Tr. 168). In her Disability Report on Appeal, plaintiff stated that her foot pain became worse on January 13, 2011 and that she is only able to walk short distances. (Tr. 174-175). She reported that migraines can sometimes keep her in bed for three consecutive days and that she has crying spells that can last for "hours." (Tr. 179).

Plaintiff's Function Report states that she lives in a house with her family. She reported that she typically remains in bed every day or sits on the couch with her left foot elevated. Plaintiff stated that she stays in a room with no light or noise, she is always tired, sleeps most of the day, and takes medication twice per day for headaches. (Tr. 155). Plaintiff reported that she is unable to walk without crutches, cannot drive, cook or perform household chores, and requires assistance when washing her hair. (Tr. 156-157). Plaintiff stated that she grocery shops and attends church once a week. (Tr. 158-159). Plaintiff reported that she is able to pay bills, count change, handle a savings account, use a checkbook, dress herself, bathe, shave, feed herself, and use the toilet without difficulty. (Tr. 158). Plaintiff listed her hobbies as sewing, reading, and crossword puzzles. (Tr. 159).

Plaintiff reported that she has difficulties lifting, squatting, bending, reaching, walking, kneeling, stair climbing, seeing, completing tasks, and remembering. (Tr.

---

[1] Citalopram is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (last visited June 6, 2014).

[2] Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain. Dependence or tolerance may occur. See Phys. Desk. Ref. 530-31 (60th ed. 2006).

160). Plaintiff stated that she does not handle stress well, does not like changes in routine, and that she once attempted to commit suicide. (Tr. 161). Plaintiff reported that she has blurry vision from her migraines and is often depressed. (Tr. 162).

## B. Hearing on April 11, 2012

At the time of the hearing, plaintiff was 49 years old. She was 5'7" tall and weighed 250 pounds. (Tr. 40-41). Plaintiff completed the twelfth grade and lived with her fiancé and two children, ages 23 and 18. (Tr. 53). Plaintiff testified that she has a driver's license, but does not drive because she experiences dizzy spells and blacks out one to two times per week. (Tr. 41).

Plaintiff stated that she was last employed in December 2010 when she worked as a shelf stocker at a grocery store, but she later remembered that she worked for one week in 2011 as a shelf stocker at Dollar General and for one day as a shelf stocker at a craft store. (Tr. 42-43). Prior to those jobs, plaintiff worked at Wal-Mart, also as a shelf stocker, for "a couple of years" and as a landscaper at a golf course for three years. (Tr. 43-44). Plaintiff testified that she left those jobs because of foot pain. (Tr. 42-45). Plaintiff stated that she also worked as a substitute cook at a school district for two years, but that she quit because she wanted full-time work. (Tr. 45). Plaintiff also testified that she operated a daycare in her home for two children in 2002. (Tr. 46). Plaintiff claimed that she is no longer able to work because she cannot walk for more than 10 or 15 minutes at one time. (Tr. 46-47).

Plaintiff stated that she requires a cane to ambulate and that she cannot sit for longer than 15 minutes if her foot is not elevated. (Tr. 46). Plaintiff stated that she has undergone numerous surgeries on her left foot due to fractures, but that her doctor cannot determine the cause of the breaks. (Tr. 47-48). At the time of hearing, plaintiff was not seeing a doctor because she could not afford health insurance and she was

taking ibuprofen for her pain. Plaintiff stated that she elevates her foot at least twice each day for about an hour, which helps to alleviate pain. (Tr. 49).

Plaintiff stated that she suffers from depression and that in August of 2010 she attempted suicide because she felt bad for accidentally closing her truck door on her grandson. The child was not hospitalized or injured. At the time of the hearing, plaintiff was not seeing a doctor for her depression. (Tr. 50). Plaintiff stated that she has difficulties sleeping and has "crying spells" for at least one hour each week. Plaintiff stated that at least two days a week she feels depressed and stays in bed for six to eight hours. (Tr. 57-58). However, plaintiff stated that she has not contemplated suicide since her attempt in August 2010. (Tr. 57).

Plaintiff also testified to having trouble with memory and concentration. (Tr. 51). Plaintiff explained that she reads approximately five books per year, but that she has difficulty concentrating on the story. (Tr. 52). Plaintiff stated that when she talks to people she tends to stutter and her blood pressure rises. (Tr. 51). Plaintiff testified that, other than reading, she has no hobbies and she is unable to leave the house alone because she is forgetful. Plaintiff explained that the last time she went to the grocery store, she forgot where her truck was and had to call her fiancé for help. (Tr. 53).

Plaintiff testified that she underwent surgery on her left foot for the first time on February 20, 2009. For six months after the surgery, plaintiff relied on a wheelchair and crutches to ambulate. Plaintiff testified that in May 2009 she underwent a second surgery to remove a "pin" from her left foot. (Tr. 54). Plaintiff had additional surgeries on her left foot on December 2009, September 2010, and May 2011. (Tr. 54-55). Plaintiff testified that she suffers from severe pain three to four times a week, which requires her to take ibuprofen and elevate her left foot. Plaintiff testified that at least once a week she has to stay in bed because she is unable to walk. (Tr. 56).

Carma A. Mitchell, M.S., a vocational expert, provided testimony regarding plaintiff's past work and employment opportunities. (Tr. 89, 90, 58-63). Ms. Mitchell listed plaintiff's vocational history and classified each position. Ms. Mitchell listed laborer of stores as unskilled, medium work, with a Specific Vocational Preparation (SVP)[3] of 2;[4] grounds caretaker as semi-skilled, medium work, with an SVP of 3;[5] child monitor (babysitting) as semi-skilled, medium work, with an SVP of 3; and school cook as skilled, light to medium work, with an SVP of 6.[6] Ms. Mitchell stated that plaintiff does not have any skills which are transferrable to the sedentary level. (Tr. 60).

The ALJ asked Ms. Mitchell whether a hypothetical individual of plaintiff's age, education, and past work experience, who is capable of performing at a sedentary exertional level, but who can only perform semi-skilled work or less, can never climb ramps, stairs, ladders, or scaffolds, can occasionally balance, stoop, kneel, crouch, or crawl, and who is required to avoid concentrated exposure to hazards, such as unprotected heights or machinery, could perform plaintiff's past work. Ms. Mitchell answered in the negative. (Tr. 60-61).

The ALJ then asked whether such a hypothetical individual would be able to perform any other work in the regional or national economies. Ms. Mitchell answered in the affirmative and testified that plaintiff could perform certain unskilled, sedentary

---

[3] The SVP level listed for each occupation in the Dictionary of Occupational Titles (DOT) connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. Hulsey v. Astrue, 622 F.3d 917, 923 (8th Cir. 2010).

[4] SVP level 2 covers occupations that require "anything beyond short demonstration up to and including 30 days." 20 C.F.R. § 656.3.

[5] SVP level 3 covers occupations that require over 30 days and up to and including 3 months. Id.

[6] SVP level 6 covers occupations that require over 1 year up to an including 2 years. Id.

jobs that have an SVP of 2, including: order clerk (of which there are 450 jobs within the state of Missouri); charge account clerk (of which there are 320 jobs within the state of Missouri), and call-out operator (of which there are 270 jobs within the state of Missouri). (Tr. 61).

The ALJ then asked whether the same hypothetical individual would be able to perform any of those jobs if that individual was required to elevate her leg up to 36 inches from the ground for one hour, two times per day. Ms. Mitchell answered in the negative and testified that there would be no other work in the regional or national economies that such an individual could perform. (Tr. 62). Ms. Mitchell confirmed that her opinions were consistent with the Dictionary of Occupational Titles (DOT).

Ms. Mitchell also testified that if the individual in the first hypothetical was unable to maintain persistence, concentration or pace for over 25 percent of the day or work week, such an individual would not be able to perform any job in the regional or national economies. (Tr. 62-63).

### C. Medical Evidence

On February 10, 2009, plaintiff saw John M. Dailey, DPM, MBA, FACFAOM, at the Missouri Foot and Ankle Institute to establish care regarding her left foot. (Tr. 480-485). Plaintiff underwent a complete lower extremity physical examination. Plaintiff complained of multiple structural deformities with fractures, hammer toe, and discomfort along her medial column. Radiographs showed previous fracture sites in her left foot, as well as non-union and a deformed medial column. Plaintiff was instructed to obtain an MRI and vascular testing. Dr. Dailey recommended surgery after the MRI revealed several metatarsal fractures in various stages of healing and the beginning of Freiberg's Disease at the third metatarsal head. No issues were found with her right foot. (Tr. 1397).

On February 12, 2009, plaintiff saw her primary care physician, Maryam Naemi, D.O., for a pre-operative examination in order to clear her for left foot surgery. (Tr. 212-218). Plaintiff underwent lab work and an EKG. (Tr. 246-254). Plaintiff's problem list included hypothyroidism, carpal tunnel syndrome, migraine, and depression with anxiety. (Tr. 213-214).

On February 17, 2009, plaintiff returned to Dr. Dailey. Treatment notes state that the cause of plaintiff's fractures was unclear because testing revealed normal findings. (Tr. 475). On February 20, 2009, plaintiff underwent surgery on her left foot, which included correction of a bunion and fractured first metatarsal bone, resection of a non-union fracture, and insertion of a bone graft and external fixator. Plaintiff was placed in a cast after the procedure. (Tr. 471, 477, 542-543, 587-588, 611-613). Plaintiff's postoperative diagnoses included hallux valgus; metatarsus varus deformity; deformed first toe; fractured first metatarsal base with compression and shortening of the metatarsal; nonunion at the first metatarsal base; and contracted digits 2, 3, 4, and 5. (Tr. 611).

On February 23, 2009, plaintiff saw Dr. Dailey for her first postoperative visit. Removal of the cast revealed no signs of infection, no signs of dehiscence, minimal pain, minimal edema, and good results. Plaintiff was told to limit her activities and apply ice. (Tr. 470). On March 2, 2009, plaintiff presented for a second postoperative visit. Dr. Dailey expressed concern with edema and wrote that "it is obvious that she is either not using the ice or not propping [the left foot] up." Plaintiff did not report any pain. Dr. Dailey instructed plaintiff to use an electrical bone stimulator to help with the healing of her bone graft and to prevent non-union. (Tr. 467-468).

On March 9, 2009, plaintiff presented for a third postoperative visit. Plaintiff denied pain and had decreased edema. Dr. Dailey wrote that plaintiff was doing well

overall with adequate surgical results. She was instructed to use the bone stimulator every day for a minimum of three hours per day. (Tr. 466). On March 16, 2009, Dr. Dailey noted that plaintiff was non-compliant with her post-surgery instructions to keep weight off her left foot. Dr. Dailey noted increased swelling and instructed plaintiff to keep her leg elevated. (Tr. 465). On March 17, 2009, Dr. Dailey completed a form for plaintiff's employer, stating that plaintiff would be unable to return to work until April 20, 2009. (Tr. 366-367).

On March 30, 2009, plaintiff presented to Dr. Dailey for a follow-up appointment. Dr. Dailey wrote that some of her lesser digits were still somewhat contracted, but that he would address that issue after plaintiff was healed from her surgery. Dr. Dailey instructed plaintiff to stay non-weight-bearing, apply ice, and continue with the bone stimulator. (Tr. 463). On the same day, Dr. Dailey completed a form, entitled "Physician's Statement of Functionality." (Tr. 363-364). Dr. Dailey listed plaintiff's diagnosis as "fracture with nonunion" and plaintiff's symptoms as "pain with deformity." Dr. Dailey reported that plaintiff was not taking any prescription medications and that she was expected to return to work on May 20, 2009. Dr. Dailey wrote that plaintiff could sit for 5 hours per day, but that she could not stand or walk in a general workplace environment. Dr. Dailey described plaintiff's progress as "improved."

On April 9, 2009 and April 20, 2009, plaintiff saw Dr. Dailey for additional postoperative follow-up appointments. Dr. Dailey noted that plaintiff was doing well with good surgical results. He wrote that once plaintiff showed adequate bone callous formation, he would allow her to start bearing weight and remove the external fixator. Although no infection was detected at the surgical site, Dr. Dailey prescribed two antibiotics. (Tr. 462). Dr. Dailey completed a form for plaintiff's employer, instructing that plaintiff was "100% non-weight-bearing." Plaintiff was restricted to "limited

standing" and work days lasting no longer than four hours for four days per week. (Tr. 360, 362). On April 29, 2009, Dr. Dailey noted that plaintiff's external fixator was loose, which showed that she was not following his instructions that she be non-weight-bearing. (Tr. 459).

On May 4, 2009, Dr. Dailey told plaintiff that he wanted to perform surgery on her left foot in order to remove the external fixator and to correct the "contracted lesser digits." (Tr. 457). This surgery was performed on May 8, 2009. (Tr. 452-453, 578). Plaintiff's postoperative diagnosis was listed as a fractured first metatarsal with nonunion; abscess fixator site medial column; external hardware with multiplane uses medial column; contracted and deformed digits 2, 3, 4, and 5; and hammer toes 2, 3, 5, and 5. (Tr. 608-610).

On May 11, 2009, plaintiff returned to Dr. Daily for a postoperative visit. No complications or issues were noted. (Tr. 451). On May 26, 2009, plaintiff presented to Dr. Dailey for removal of the sutures and superficial fixators. Dr. Dailey instructed plaintiff to continue non-weight-bearing and use the bone stimulator. (Tr. 449-450). On May 28, 2009, plaintiff reported minimal pain and edema. Dr. Dailey placed plaintiff on a non-weight-bearing restriction (Tr. 448).

On June 8, 2009, Dr. Dailey noted "good surgical results" and administered hydrotherapy. (Tr. 447). Dr. Dailey wrote that plaintiff should be excused from work from June 12, 2009 to June 15, 2009. (Tr. 628). On June 15, 2009, Dr. Dailey instructed plaintiff to begin physical therapy and continue with hydrotherapy. Dr. Dailey wrote that he was gradually trying to get her to bear weight through use of a cam walker boot. Plaintiff reported no pain or edema and she was ambulating well. (Tr. 446). On June 16 and 19, 2009, Dr. Dailey completed forms for plaintiff's employer

stating that she could not work more than four to six hours per day for approximately two to four months. (Tr. 356-358).

Plaintiff participated in physical therapy on June 16, 17, 18, 19, 22, 23, 24, and 25, 2009. (Tr. 438-446). At the end of the therapy, plaintiff was still in the cam walker boot and using the bone stimulator, but overall she was described to be doing very well and was healing with good results. (Tr. 438). On July 16, 2009, plaintiff saw Dr. Dailey for a follow-up appointment. Plaintiff reported slight discomfort at the second toe of her left foot, but otherwise reported no pain. Dr. Dailey wrote that plaintiff had minimal edema, was back to work at Wal-mart and was doing "exceptionally well." Dr. Dailey told plaintiff that she could slightly increase her activities. (Tr. 437).

On September 15, 2009, plaintiff received custom orthotics from the Foot and Ankle Institute. (Tr. 361). On the same day, plaintiff reported to Dr. Dailey that she was 100% pain free. Dr. Dailey wrote that plaintiff was sill using the bone stimulator, that the graft site appeared to be healed, that she was doing well overall, was happy, and had returned to work and most activities. (Tr. 436). On September 21, 2009, plaintiff saw Dr. Dailey for a sharp pain in her left foot. Dr. Dailey noted that up until this point, plaintiff had been pain free. Plaintiff was placed in a high top cam walker cast boot and told to use the bone stimulator. (Tr. 434-435).

On September 22, 2009, plaintiff returned to Dr. Dailey for excision of an infected ingrown toenail on her left foot. (Tr. 431-432, 544-546, 614). On September 23, 2009, plaintiff saw Dr. Dailey for a follow-up regarding her toe surgery. Dr. Dailey wrote that the nail surgical site was healing nicely with good results. (Tr. 428, 430). On September 24, 2009, results from the three phase bone scan of the second and third metatarsals of plaintiff's left foot revealed on-going healing fractures. Dr. Dailey wrote that he would continue to treat her with conservative fracture care. (Tr. 429,

550-551).

On October 1, 2009, plaintiff saw Dr. Dailey for postoperative care and to review the MRI results, which confirmed stress fractures involving her second and third metatarsals. Plaintiff was kept in the cam walker boot to immobilize and stabilize the fracture sites. She was instructed to continue with the bone stimulator.  Dr. Dailey noted that he could not pinpoint an underlying reason as to why she continued to experience fractures. (Tr. 703). Plaintiff was prescribed 800mg ibuprofen/Motrin tablets for pain. (Tr. 702).

On October 5, 2009, October 15, 2009 and November 5, 2009, plaintiff saw Dr. Dailey for follow-up appointments regarding multiple stress fractures in her left foot. (Tr. 422-426).  Dr. Dailey wrote that he could not determine the cause of the fractures and did not know why her bone graft dissolved. Plaintiff was instructed to avoid weight bearing activity and to use a cam walker boot.  (Tr. 345-346, 370). Plaintiff was given a prescription for Vicodin on October 5, 2009. (Tr. 426).  On November 24, 2009, plaintiff saw Dr. Dailey for a follow-up appointment.  Treatment notes state that the cause of plaintiff's fractures was still unknown.  Dr. Dailey wrote that plaintiff had adequate bone callous formation and that she was improving despite her discomfort. Dr. Dailey ordered bone density testing. (Tr. 420, 549, 555).

On December 1, 2009, plaintiff saw Dr. Dailey for review of her bone density results and to discuss a treatment plan. Dr. Dailey wrote that her bone density results were within normal limits, there were no abnormalities noted, and she was negative for osteopenia and osteoporosis. (Tr. 839). Dr. Dailey recommended that she undergo surgery to realign her left foot medial column.  (Tr. 416). On December 9, 2009, plaintiff saw Dr. Dailey for a preoperative consultation. Dr. Dailey noted that "[e]ven though we have done a number of things to this left foot, it continues to break down

and the previous bone graft at the base of the first metatarsal is completely disintegrated." (Tr. 412).

On December 11, 2009, plaintiff underwent surgery for multiple structural deformities, including non-union, a fractured metatarsal base with destruction of a bone graft and lesser metatarsal fractures with hammer toes in her left foot. (Tr. 409, 568, 605-607). Dr. Dailey instructed that plaintiff not work for eight to nine weeks post-surgery. (Tr. 415). Plaintiff's postoperative diagnosis was listed as deformed first metatarsal; hallux valgus deformity; metatarsus primus varus deformity; destroyed and disintegrated old bone graft, medial column; nonunion first metasarsal; fractured first metatarsal; deformed first toe; and hammer toes 2-3-4-5. (Tr. 605).

On December 14, 23, and 31, 2009, plaintiff saw Dr. Dailey for postoperative care. Removal of the cast revealed no signs of infection, minimal pain, minimal edema, and "good results." (Tr. 405-408). Plaintiff was instructed to take 800mg of ibuprofen/Motrin three times a day and to remain non-weight-bearing. (Tr. 684). On January 5, 2010, plaintiff presented to Dr. Dailey stating that she bumped her left forefoot on a bathroom cabinet. Dr. Dailey found that there was minimal edema, but otherwise, plaintiff was clinically uninjured by the trauma. (Tr. 404, 496).

On January 14 and 25, February 1 and 15, and March 1 and 22, 2010, plaintiff saw Dr. Dailey for postoperative care. Plaintiff was without pain and no issues or complications were noted. Treatment notes consistently stated that plaintiff was healing nicely. She was instructed to stay non-weight-bearing and ice the surgical area. (Tr. 395-397, 399-400, 402). Plaintiff was instructed to take 800mg tablets of ibuprofen/Motrin three times daily. (Tr. 678). X-ray results from February 15, 2010 and March 22, 2010 revealed good alignment, fixation, and healing, with no other osseous abnormalities. (Tr. 493, 495).

On April 7, 2010, plaintiff saw Dr. Dailey for postoperative care. Dr. Dailey wrote that plaintiff had no complaints of edema or pain and that she was making "good progress." Plaintiff was instructed to stay in her cam walker boot and slowly increase her activities. (Tr. 394). On February 10, 2010, Dr. Dailey completed a form for plaintiff's employer, stating that plaintiff would be unable to work for no more than four hours per day for five days per week from May 1, 2010 to July 1, 2010. (Tr. 340-341).

On April 28, 2010, plaintiff saw Dr. Dailey with complaints of pain in her left foot. Radiographs revealed that she was healing adequately from her bone graft surgery. Dr. Dailey noted that she might have a small fracture, but could not be sure. Dr. Dailey instructed that plaintiff seek additional physical therapy. (Tr. 393, 492).

On May 3, 2010, plaintiff began her first of nine sessions of physical therapy at the Foot and Ankle Institute. (Tr. 392). Plaintiff was described to have edema, cicatrix, tenosynovitis, inflammation of left forefoot area, postoperative left forefoot reconstructive surgery, and history of multiple fractures and non-union. Plaintiff returned for physical therapy sessions on May 4-7, 10, and 12-14, 2010. (Tr. 383-392). On her last session, Dr. Dailey wrote that plaintiff was pain free, her x-rays looked good, and she was improving with conservative physical therapy. However, Dr. Dailey noted that "based on her past this can change at any time." (Tr. 383). On the same date, Dr. Dailey completed a form for plaintiff's employer, stating that she would be unable to work for no more than three or four hours per day for five days per week until August 15, 2010 and that it would be necessary for plaintiff to be absent from work during flare-ups. (Tr. 343-344).

On May 17, 2010, plaintiff saw Dr. Naemi for a follow-up regarding her hypertension. Plaintiff reported constant fatigue and drastic mood swings. Dr. Naemi instructed plaintiff to continue her hypertension medication, decrease sodium and sugar

intake, exercise, and increase Vitamin D intake.    Plaintiff was referred to a gastroenterologist for chest pain. (Tr. 207-208). On May 20, 2010, plaintiff underwent abdomen testing due to complaints of right upper quadrant pain. Results revealed sludge in the gallbladder without stones and two cysts in the liver. (Tr. 287).

On May 27, 2010, plaintiff saw Dr. Dailey for a follow-up appointment, an x-ray examination, and a bone scan. (Tr. 382, 490, 832-833).  Plaintiff complained of some pain at her metatarsophalangeal joints in her left foot.  Dr. Dailey attributed her pain to arthritis and wrote that he did not know why plaintiff suffered from spontaneous fractures, stating that all "testing has found she is healthy and I do not really have an explanation for the chronic fractures.  Presently everything is healed[.]" (Tr. 382).  Dr. Daily  instructed plaintiff to continue wearing orthotics and refrain from heavy activity.

On June 7, 2010, plaintiff underwent a nuclear medicine hepatobiliary scan to evaluate potential gallbladder dysfunction.  The results were within normal limits and no obstruction or other abnormality was revealed. (Tr. 266-267, 286).  On June 18, 2010, Dr. Dailey wrote a note, stating that plaintiff can return to work on June 21, 2010 on "fully duty." (Tr. 368).  On June 24, 2010, plaintiff saw Dr. Dailey for a follow-up appointment. Treatment notes state that plaintiff is "back in regular shoes and back to most normal activities . . . and is still staying pain free."  (Tr. 353).  Dr. Dailey wrote that plaintiff's left foot was "healing nicely and staying healed." (Tr. 352-353).  Dr. Dailey instructed plaintiff to slowly increase her activities and stay in a supportive shoe.

On August 11, 2010, plaintiff presented to Dr. Naemi with reports of increased depression and a desire to hurt herself.  Plaintiff explained that she "took a bunch of ibuprofen" because she was stressed and wanted to commit suicide. Plaintiff stated that she accidently shut her truck door on her 15-month old grandson, which upset her. Plaintiff complained of nausea and tingling in the right side of her mouth.   Plaintiff

reported that she had not been taking her hypertension medication for a week. Dr. Naemi instructed plaintiff to obtain an immediate mental evaluation. (Tr. 204-205).

At the instruction of Dr. Naemi, plaintiff presented to St. Joseph's Hospital West for her attempted suicide and complaints of a severe migraine. Plaintiff underwent a physical exam and was admitted into the DePaul Health Center until August 13, 2010. At discharge, plaintiff's mental condition improved and she "was able to recognize her situation as being an accident and that her grandchild was not seriously harmed." (Tr. 290-317, 1174-1183).

On August 26, 2010, plaintiff saw Dr. Dailey with complaints of left foot pain that she reported had been ongoing for two to three weeks. (Tr. 380). X-ray results revealed a slight gap in her bone graft and a loose screw in her compression plate. (Tr. 489). Radiographs did not reveal a fracture or dislocation. Dr. Dailey recommended surgery and instructed that she not work until October 10, 2010; however, he described her prognosis as "excellent." (Tr. 335, 380). The surgery was performed on September 3, 2010 for non-union repair, removal of a deep buried pin, insertion of a bone graft, and application of a bone plate. (Tr. 336, 375, 558-560).

On September 8, 15, and 22, 2010, plaintiff returned to Dr. Dailey for post-operative follow-up appointments and x-ray examinations. (Tr. 372-374, 487-488). Treatment notes state that plaintiff was "doing very well" with no pain, no edema, and no signs of infection. Dr. Dailey instructed plaintiff to remain in the cam walker boot, use crutches, and limit her activities. (Tr. 375). Plaintiff was administered hydrotherapy physical therapy for ten minutes on September 22. (Tr. 647).

On October 6, 2010, plaintiff saw Dr. Dailey for a post-operative follow-up appointment. (Tr. 369, 486). An X-ray revealed that the surgery site was healing nicely with some bone callous formation, arthritic changes and a possible bone cyst, but

no other osseous abnormalities. (Tr. 486). Treatment notes state that plaintiff was still using the cam walker boot, crutches and the bone stimulator, that she was 100% asymptomatic along the medial column where her surgery took place, and that no edema was present. Although plaintiff complained of some discomfort at the metatarsal head, Dr. Dailey wrote that plaintiff was healing "quite nicely" and that he did not have an explanation for the discomfort, other than the fact that there is arthritis at the metatarsophalangeal joints. Dr. Dailey suggested that she stay in the cam walker boot and continue with the bone stimulator. (Tr. 369).

On October 9, 2010, plaintiff returned to Dr. Dailey for a follow-up appointment with complaints of discomfort at her metatarsal head two, three, and four. Dr. Dailey instructed plaintiff to stay in the cam walker boot and continue with the bone stimulator. (Tr. 646). On October 25, 2010, plaintiff returned to Dr. Dailey for a follow-up appointment. Dr. Dailey wrote that plaintiff's surgery site was pain free and without edema. However, plaintiff complained of pain in the lesser metatarsophalangeal joint area. (Tr. 644). Dr. Dailey ordered a triphasic bone scan. (Tr. 642).

On November 2, 2010, plaintiff returned to Dr. Dailey for a follow-up appointment with complaints of pain in the left forefoot area. The triphasic bone scan revealed that plaintiff's previous fractures and metatarsals two and three were completely healed and that the surgery site involving the first metatarsal base was healing nicely. However, the scan revealed a new stress fracture of the fourth metatarsal, which explained plaintiff's pain. Dr. Dailey wrote that he was confused as to how she developed another fracture while she was in a cam walker boot. Dr. Dailey advised her to reposition the bone stimulator. (Tr. 641).

On February 8, 2011, Joseph M. Long, Ph.D., submitted a report of his psychological examination of plaintiff. (Tr. 1155-1157). Dr. Long interviewed plaintiff

and found no evidence of gross impairment of psychological functioning due to hallucinations, delusional ideation, or extreme liability.  Dr. Long noted that her only formal mental health treatment occurred in August of 2010 when she spent three days in a Psych Unit after she attempted suicide.  Plaintiff denied any current suicidal ideation and reported that she did not cry as often. Plaintiff told Dr. Long that she "tries to keep a positive attitude but starts to feel overwhelmed when she thinks about her financial problems and wants to stay in bed." (Tr. 1156). Plaintiff described her energy level as "mediocre." (Tr. 1157).  Dr. Long expressed his opinion that plaintiff suffered from moderate severity anxiety disorder and mild severity depressive disorder. (Tr. 1157).  Dr. Long wrote that plaintiff's ability to understand and remember instructions appeared to be intact, her ability to sustain concentration and persist with tasks appeared to be no more than moderately impaired, and her social and adaptive functioning appeared to be barely in the moderate range of impairment. (Tr. 1157).

On February 16, 2011, Sherry Bassi, Ph.D. completed a psychiatric review technique. (Tr. 1162-1173).  Dr. Bassi identified plaintiff's impairments as non-severe affective disorders and non-severe anxiety-related disorders. Dr. Bassi opined that plaintiff had no repeated episodes of decompensation and only mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace.

On February 17, 2011, Dr. Dailey completed a physical medical source statement. (Tr. 1158-1160).  Dr. Dailey reported that plaintiff can occasionally lift or carry up to 20 pounds; can sit for a total of 8 hours in an 8-hour workday; and is unlimited in her abilities to reach, handle, finger, feel, see, speak, and hear. Dr. Dailey reported that plaintiff can occasionally stoop, kneel, crouch, or crawl, but cannot climb or balance.  Dr. Dailey wrote that plaintiff's chronic foot pain and deformities prevent

her from performing activities that involve standing and walking and that she requires an assistive device for ambulation.

On February 22, 2011, Jason Lawrence, a single decisionmaker[7] (SDM), completed a Physical Residual Functional Capacity Assessment (PRFCA). (Tr. 65-70). Mr. Lawrence reported that plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of at least 2 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; push and/or pull with limitations in the lower extremities; never climb or balance, and occasionally stoop, kneel, crouch, or crawl. Mr. Lawrence did not report any manipulative, visual, or communicative limitations. Mr. Lawrence reported that plaintiff must avoid concentrated exposure to hazards, such as machinery and heights.

On May 13, 2011, plaintiff underwent surgery on her left foot because of a fractured toe, loose hardware, and an abscess. (Tr. 1203). The surgery included a hammer toe arthroplasty, an I&D abscess, and removal of hardware. (Tr. 1204-1205).

On March 3, 2012, plaintiff presented to the emergency room at Mercy Hospital with complaints of left foot pain. (Tr. 1588-1602). Plaintiff's diagnoses included degenerative arthritis of the foot and history of foot surgery. Radiology results did not reveal a fracture or dislocation. Plaintiff was discharged with instructions to rest, elevate and ice the extremity, apply ACE wrap as needed for swelling, use crutches as needed for ambulation, and to take 800mg of ibuprofen three times per day or a Percocet as needed for pain.

### D. Additional Medical Evidence

---

[7] Missouri is one of 20 states on which non-medical disability examiners are authorized to make certain initial determinations without requiring a medical or psychological consultant's signature. See Office of the Inspector General, Audit Report Single Decisionmaker Model – Authority to Make Certain Disability Determinations without a Medical Consultant's Signature. (Aug. 2013).

On December 12, 2012, plaintiff presented to Harry Visser, DPM at Mid-West Podiatry for evaluation of chronic foot pain. (Doc. #12-1). Dr. Visser wrote that as a consequence of her multiple left foot surgeries, plaintiff "has a very stiff and maligned foot with associated chronic pain." Dr. Visser expressed his opinion that although further reconstruction could be considered, he doubted that it would benefit her in a significant way. Dr. Visser wrote that plaintiff "is basically disabled." He placed her on "a Medrol Dosepak[8] and a nonsteroidal to try to reduce some of the symptoms.

On January 16, 2013, plaintiff returned to Dr. Visser for a follow-up appointment. (Doc. #12-1). Plaintiff reported that her pain was about the same and that she recently heard and felt a "pop" in her left foot. Dr. Visser wrote that plaintiff will consider left reconstruction after she obtains new insurance.

On February 8, 2013, Dr. Visser, completed a residual functional capacity form. (Doc. #12-1). Dr. Visser reported that plaintiff suffers from general fatigue and weakness, muscle spasm, tenderness in joints and/or feet, weight gain or loss, swelling in extremities, difficulty walking, limitation in joint and/or feet movement, and impaired sleep. Dr. Visser reported that plaintiff can only walk 100 feet without rest, sit continuously for 15 minutes, stand continuously for 9 minutes, lift less than 10 pounds, and carry less than 10 pounds. Dr. Visser opined that plaintiff would need to be absent from work for more than 3 days each month.

### III. The ALJ's Decision

In the decision issued on June 11, 2012, the ALJ made the following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2015.

2.  Plaintiff has not engaged in substantial gainful activity since February 10, 2009, the alleged onset date.

---

[8] Medrol is the brand name for methylprednisolone and is used to relieve inflammation and to treat certain forms of arthritis.

3.    Plaintiff has the following severe impairments: Residuals of foot surgeries, anxiety, and depression.

4.    Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except that she will never be able to climb ramps, stairs and scaffolding; she will only occasionally be able to balance, stoop, kneel, crouch and crawl; she will need to avoid concentrated exposure to hazards of unprotected heights and machinery; and she will be limited to the performance of semi-skilled work.

6.    Plaintiff is unable to perform any past relevant work.

7.    Plaintiff was born on December 15, 1962 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.    Plaintiff has at least a high school education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills.

10.   Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.   Plaintiff has not been under a disability, as defined in the Social Security Act, from February 10, 2009, through the date of this decision.

(Tr. 17-28).

## IV.  Legal Standard

To be eligible for SSI benefits, a claimant must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). A child under the age of eighteen will be declared disabled if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). oT

determine whether a child claimant is disabled, the Commissioner employs a three-step evaluation process. The Commissioner first determines whether the child is engaged in substantial gainful activity.  If the child is so engaged, she is not disabled. Second, the Commissioner determines whether the child has a "severe impairment."  If the child's impairment is not severe, she is not disabled.  Finally, the Commissioner determines whether the child's impairment meets, medically equals, or functionally equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the child's impairment is, medically equals, or functionally equals a listed impairment, she is disabled under the Act. 20 C.F.R. § 416.924.

In determining functional equivalence, the Commissioner considers the child claimant's functioning in broad areas of functioning, or "domains."  The six domains are: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).


For an impairment to functionally equal a listed disability, it must result in either a marked limitation in two domains or an extreme limitation in one domain. 20 C.F.R. § 416.926a.  The Commissioner will find a "marked" impairment in any domain when the impairment(s) interferes seriously with the claimant's ability to independently initiate, sustain, or complete activities. A "marked" impairment is the equivalent of functioning found on standardized testing with scores that are a least two, but less than three, standard deviations below the mean. 20 C.F.R. § 416.923a(e)(2)(i).   An "extreme" limitation is found in a domain when a claimant's impairment interferes very seriously with the ability to independently initiate, sustain, or complete activities.  It is the equivalent of functioning found on standardized testing with scores that are at

least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3)(i).

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2011) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2011)). The Court may not reverse merely because the evidence could support a contrary outcome. Id. at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record. See Stewart v. Sec. of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992). The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, those findings must simply be supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

## V. **Discussion**

Plaintiff contends that the ALJ erred by (1) failing to properly consider her subjective complaints; and (2) failing to properly consider Dr. Visser's opinion. The plaintiff further argues that the "Court should direct that this case be reviewed by SSA's medical staff as key medical evidence was added to the record since a State agency medical consultant last reviewed this case." [Doc. #12].

### A. Plaintiff's Credibility

An ALJ's credibility findings must be supported by substantial evidence on the

record as a whole. <u>Cox v. Barnhart</u>, 471 F.3d 902, 907 (8th Cir. 2006). In <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit articulated five factors for evaluating pain and other subjective complaints: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5) functional restrictions."

"The ALJ is not required to discuss methodically each <u>Polaski</u> consideration, so long as he acknowledged and examined those considerations before discounting [a claimant's] subjective complaints." <u>Partee v. Astrue</u>, 638 F.3d 860, 865 (8th Cir. 2011). The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1218 (8th Cir. 2001). An ALJ may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. <u>Polaski</u>, 739 F.2d at 1322. When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the Court will usually defer to the ALJ. <u>Casey v. Astrue</u>, 503 F.3d 687, 696 (8th Cir. 2007).

In this case, it is true that the ALJ did not cite to the <u>Polaski</u> decision and did not discuss plaintiff's medications or side effects. However, "a failure to explicitly cite <u>Polaski</u> is not alone grounds for remand if the ALJ adequately considers some of the required factors." <u>Ross v. Astrue</u>, 4:12-CV-334-CDP (E.D. Mo. Mar. 27, 2013); <u>see</u> <u>also</u> <u>Buckner v. Astrue</u>, 646 F.3d 549, 558 (8th Cir. 2011) (Eighth Circuit affirmed ALJ's credibility determination even though ALJ only discussed four of the <u>Polaski</u> factors). Because the ALJ here discussed the majority of the <u>Polaski</u> factors and provided good reasons for his findings, the Court finds that the ALJ did not err in his credibility determination.

The ALJ provided the following reasons for finding that plaintiff's statements

concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible: (1) medical evidence failed to establish any physical or mental impairment that persisted at a disabling severity for 12 months or longer; (2) plaintiff did not seek medical treatment for her emotional/mental disability; (3) plaintiff did not seek consistent medical treatment for her left foot issues after November 2010; (4) plaintiff acknowledged that she was able to engage in a variety of daily activities; (5) plaintiff was employed after her alleged onset date; (6) plaintiff received unemployment compensation in 2010; and (7) plaintiff had a poor work history with low earnings. (Tr. 25).

Regarding plaintiff's depression and anxiety, the ALJ acknowledged that plaintiff attempted suicide in August of 2010 and that she was subsequently admitted into a mental health facility for three days. However, the ALJ also took note of the fact that the record did not contain evidence of any additional mental health treatment, psychological counseling, or hospitalizations. "A claimant's allegations of disabling pain or other subjective symptoms may be discredited due to an absence of hospitalization, limited treatment of symptoms, and a failure to diligently seek medical care." Powell v. Colvin, 4:12-CV-1996-DDN (E.D. Mo. Mar. 31, 2014) (citing Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006)); 20 C.F.R. § 416.929(c)(3)(v) (the agency will consider the claimant's treatment when evaluating her symptoms). The ALJ also took into account the opinion of Dr. Long, who performed a psychological examination on plaintiff and who opined that plaintiff suffered from *moderate* severity anxiety disorder and *mild* severity depressive disorder. (Tr. 1155-1157). Thus, the Court finds that the ALJ's credibility findings as to plaintiff's mental health issues is supported by substantial evidence on the record as a whole.

In analyzing plaintiff's complaints regarding the severity of her left foot pain and

discomfort, the ALJ considered plaintiff's own report that she was able to attend to personal care activities, shop in stores, manage money, sew on occasion, do crossword puzzles on occasion, and attend church services. The ALJ reasoned that her ability to engage in such activities tended to be incongruous with a finding for limitation. The Eighth Circuit has held that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001); see also Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004) (The Eighth Circuit held that the ALJ properly considered the fact that plaintiff watched television, read, drove, and attended church services in concluding that her subjective complaints were not credible).

The ALJ also considered the fact that in the fourth quarter of the 2010 calendar year plaintiff was collecting unemployment benefits, which required her to affirmatively state that she was able and willing to work. An application for unemployment compensation is "some evidence, though not conclusive, to negate" a claim of disability. Johnson v. Chater, 108 F.3d 178, 180-81 (8th Cir. 1997). The ALJ also took note of her poor work history. See Dipple v. Astrue, 601 F.3d 833, 837 (8th Cir. 2010) (listing a claimant's work record as consideration when evaluating credibility).

The ALJ further reasoned that the medical record did not support the severity of plaintiff's physical complaints. The ALJ explained that although plaintiff had a history of multiple surgeries to her left foot, she "routinely was shown by postoperative records between such surgeries to be with improvements in function to levels inconsistent with a finding [] for disability." (Tr. 11-3, at p. 9). In support of this finding, the ALJ summarized plaintiff's medical record in great detail.

The ALJ noted that on February 20, 2009 and May 8, 2009, plaintiff underwent surgery on her left foot, but that subsequent to these surgeries, Dr. Dailey described

plaintiff to be recovering "exceptionally well" and ambulating nicely with good range of motion.  The ALJ noted that Dr. Dailey described plaintiff to be "100 percent pain free" with minimal edema.   Treatment notes showed that plaintiff was back to wearing a regular left shoe and returned to work by July 16, 2009. On September 15, 2009, Dr. Dailey reported that plaintiff returned to work and most activities. The ALJ referenced plaintiff's  bone scan results, which revealed additional left foot fractures in late 2009, but noted that plaintiff was "prescribed conservative fracture care (use of a Cam Walker cast boot)." The same imaging also revealed a breakdown of her bone graft, which was resolved by surgical intervention on December 11, 2009.

The ALJ noted that regular post-operative examinations with Dr. Dailey showed minimal pain and edema, no signs of infection, and no signs of dehiscence, while radiographs showed adequate healing of the bone graft site with evidence of bone callous formation.  Treatment notes from June 24, 2010 stated that plaintiff was able to return to work without restriction.   In August 26, 2010, Dr. Dailey found loose screws from the internal hardware of her left foot. On September 3, 2010, Dr. Dailey removed the loose hardware and inserted a bone graft with bone paste. The ALJ noted that subsequent to this surgery, plaintiff was described to be with minimal pain, no edema, no signs of infection, no signs of dehiscence. On October 6, 2010, Dr. Dailey described plaintiff as 100 percent asymptomatic. On November 2, 2010, plaintiff reported increased pain, while a bone scan revealed successful healing of her previous fractures.  Dr. Dailey recommended conservative treatment through the use of a cam walker boot in the case of an additional fracture.

The ALJ then took note of the fact that the record lacked any evidence of further treatment until May 13, 2011, at which time plaintiff had surgery on a fractured fourth toe.  After this surgery the record lacked any evidence of further treatment until March

3, 2012, at which time plaintiff presented with foot pain. Radiographs revealed "mild" degenerative changes and evidence of prior surgeries. Plaintiff was treated with pharmaceutical management. The ALJ also considered Dr. Dailey's February 17, 2011 functional assessment of plaintiff.

The Court finds that substantial medical evidence supports the ALJ's conclusion that plaintiff's condition improved after each surgical procedure, revealing a lack of disabling limitations for a continuous 12 month period, and that plaintiff's minimal treatment after November 2010 suggests that the severity of her symptoms decreased to a less than disabling level. Because the ALJ expressly discounted plaintiff's credibility and articulated good reasons for doing so, the Court defers to the ALJ's credibility assessment.

### B. Dr. Visser's Opinion

Plaintiff argues that the opinion of Dr. Visser, which was received after the ALJ's decision but before the Appeal's Council's decision, is new evidence that warrants remand.

If a plaintiff submits new evidence to the court that was not included in the record before the ALJ, "42 U.S.C. § 405(g) authorizes [the court] to remand [the] case to the Commissioner where 'new and material evidence is adduced that was for good cause not presented during the administrative proceedings.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (citing Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000)). "Material evidence is 'non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Commissioner's determination.'" Id. (citing Woolf v. Shalala, 3 F.3d 1210, 1215 (8th Cir. 1993)).

In the instant case, the ALJ issued his decision on June 11, 2012. (Tr. 17-28).

Plaintiff requested review from the Appeals Council on July 11, 2012. (Tr. 11-12). The new evidence at issue here includes: (1) Dr. Visser's treatment notes, dated December 12, 2012; (2) Dr. Visser's treatment notes, dated January 16, 2013, and (3) an RFC assessment, dated February 8, 2013. See Doc. #12-1, Ex. A. There is no evidence in the record that plaintiff submitted Dr. Visser's treatment notes or RFC assessment to the Appeals Council. The Appeals Council denied plaintiff's request for review on April 19, 2013. (Tr. 1-5).

First, the Court finds that Dr. Visser's opinions are not relevant because they do not relate to the relevant time period. The relevant time period here ended on June 11, 2012, the date that the ALJ issued his decision. The new evidence submitted by plaintiff begins on December 12, 2012. There is also no indication that Dr. Visser was even a treating physician during the relevant time period.

Furthermore, even if Dr. Visser's treatment notes and RFC were relevant, plaintiff does not provide any explanation for why she failed to submit this evidence to the Appeals Council prior to their denial of her request for review. Without a showing of "good cause," remand is not appropriate. Krogmeier, 294 F.3d at 1024; Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) ("new evidence not considered by the Appeals Council will be considered by the reviewing court only upon a showing of materiality and good cause for not incorporating it in the earlier proceedings."). Thus, the Court finds that the opinions of Dr. Visser do not constitute as new evidence that warrants remand.

### C. Remand to SSA Medical Staff

Lastly, plaintiff argues that the Court should direct that this case be reviewed by a medical staff member of the SSA because key medical evidence (the opinions of Dr. Visser) were added to the record subsequent to the review of this case by a state

agency medical consultant.

As discussed above, Dr. Visser's opinions do not relate to the relevant time period and plaintiff has failed to show good cause for why she did not submit this evidence to the Appeals Council prior to its denial. Because these records are not part of the record, there is no basis for review of this case by a state agent medical consultant.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [Doc. #12] is **denied**.


CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of September, 2014.